UNITED STATES of America,
Plaintiff,

v.

0.13 ACRE, MORE OR LESS, SITUATE IN KANAWHA COUNTY, STATE OF WEST VIRGINIA, ET AL., Defendants.

No. CIV.A. 2:99–1060.

United States District Court,
S.D. West Virginia,
Charleston Division.

May 24, 2004.

Benjamin L. Bailey, Bailey & Glasser, Charleston, WV, Guardian ad litem for Condemnees, Winifred Martin, mother of Robert Charles Martin and Jouce Ann Martin.

O. Gay Elmore, Jr., Elmore & Elmore, Charleston, WV, for Defendant Douglas Q. Gale.

Michael L. Keller, Kasey Warner, United States Attorney's Office, Charleston, WV, for Plaintiff the United States of America.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Pending is defendant Douglas Q. Gale's motion for summary judgment [Docket 47]. The court **GRANTS** Gale's motion for summary judgment insofar as Gale seeks compensation for the value of the tax lien on the date of condemnation plus any interest accrued on the value of the tax lien since that date and **DENIES** the motion insofar as it seeks any additional compensation.

## I.  FACTUAL BACKGROUND

On November 22, 1999, the Sheriff of Kanawha County sold a tax lien for delinquent *ad valorem* taxes on real estate listed in the name of Winifred Martin.[1] The lien was purchased for $973.87 by Destiny 98TD (Destiny), a Delaware Trust. Seven days later, on November 29, 1999, the United States took the property pursuant to 40 U.S.C. § 258a. Prior to the taking, the United States was informed by the Sheriff that there were no outstanding taxes due on the property. The United States instituted this action with a "Complaint in Condemnation" and deposited just compensation for the property taken. The "Complaint in Condemnation" included a list of persons that "have or claim an interest in the property . . ." [Docket 1]. Destiny was not identified as an interested party on this list.

Ultimately, Destiny's tax lien was not redeemed within the statutory period. On April 25, 2001, the Clerk of the Kanawha County Commission purported to convey the property to Destiny by tax deed pursuant to West Virginia's statutory scheme for tax sales. On August 13, 2001, Destiny conveyed the property to Gale via quitclaim deed.

On June 11, 2002, Judge Haden entered an Order staying and removing the case from the active docket. The only issue remaining at that time was a final payout of registry funds to Winifred Martin and her two incompetent children. Judge Haden previously appointed a guardian *ad litem* to represent the Martins. The appointment was designed to facilitate the appointment of a guardian in South Carolina, where the Martins reside, and to overcome further legal obstacles hindering final payout.

On August 22, 2003, Gale moved to be joined as a party. Judge Haden granted the request. On September 30, 2003, Gale filed a "Complaint for Declaratory Judgment" (the Second Complaint).[2] The guardian *ad litem* answered the Second Complaint and the United States responded. The final deadline for briefing lapsed April 6, 2004. Although the guardian *ad litem* was not explicitly permitted an opportunity to participate in the briefing, he was served with the parties' joint motion for entry of a scheduling order, along with the parties' briefing. Accordingly, the court concludes the guardian *ad litem* would adopt the United States' response to Gale's motion for summary judgment.

Relying upon various provisions of the *West Virginia Code*, Gale asserts he was a

---

1. For background information on West Virginia's statutory scheme governing forfeited and delinquent lands see Robert L. Shuman & Robert Louis Shuman, *The Amended and Reenacted Delinquent and Nonentered Land Statutes–The Title Examination Ramifications*, 98 W. Va. L.Rev. 537, 553 (1996) and *Plemons v. Gale*, 298 F.Supp.2d 380, 384–86 (S.D.W.Va. 2004).

2. This appears to be a fugitive document not contemplated by Rule 71A(e), Federal Rules of Civil Procedure. The court does not deem the motion for summary judgment as filed in support of the Second Complaint. Rather, the motion is more properly characterized as seeking disbursement of just compensation currently deposited in the court's registry.

bona fide purchaser for value without notice of the condemnation proceeding. He seeks reimbursement for all monies expended in connection with the property, including the amount paid at the tax sale, interest, notice fees, certified letter fees, publication fees, clerk fees, taxes for the year 2000, and legal fees to date. The amount sought totals approximately $8,000.00. The United States opposes the request, asserting Gale is entitled only to the value of the tax lien and accumulated interest.

## II. DISCUSSION

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Title 40 U.S.C. § 258a governed the taking in this case. The statute provides:

In any proceeding in any court of the United States outside of the District of Columbia which has been or may be instituted by and in the name of and under the authority of the United States for the acquisition of any land or easement or right of way in land for the public use, the petitioner may file in the cause, with the petition or at any time before judgment, a declaration of taking signed by the authority empowered by law to acquire the lands described in the petition, declaring that said lands are thereby taken for the use of the United States. Said declaration of taking shall contain or have annexed thereto—

(1) A statement of the authority under which and the public use for which said lands are taken.

(2) A description of the lands taken sufficient for the identification thereof.

(3) A statement of the estate or interest in said lands taken for said public use.

(4) A plan showing the lands taken.

(5) A statement of the sum of money estimated by said acquiring authority to be just compensation for the land taken.

Upon the filing said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the persons entitled thereto; and said compensation shall be ascertained and awarded in said proceeding and established by judgment therein, and the said judgment shall include, as part of the just compensation awarded, interest in accordance with section 6 of this Act on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been paid into the court. No sum so paid into the court shall be charged with commissions or poundage.

Upon the application of the parties in interest, the court may order that the money deposited in the court, or any

part thereof, be paid forthwith for or on account of the just compensation to be awarded in said proceeding. If the compensation finally awarded in respect of said lands, or any parcel thereof, shall exceed the amount of the money so received by any person entitled, the court shall enter judgment against the United States for the amount of the deficiency. Upon the filing of a declaration of taking, the court shall have power to fix the time within which and the terms upon which the parties in possession shall be required to surrender possession to the petitioner. The court shall have power to make such orders in respect of encumbrances, liens, rents, taxes, assessments, insurance, and other charges, if any, as shall be just and equitable.[3]

40 U.S.C. § 258a.

■ The parties' dispute presents two very narrow issues, not answered directly by § 258a. First, the court must determine who is entitled to the monies deposited by the United States as just compensation, the original property owners (the Martins) or the tax lien holder (Mr. Gale), given that the tax lien existed at the time of the taking, the state statutory redemption period passed after the taking, and the lienholder received the tax deed prior to final distribution of the United States' deposit. Second, if the court awards the bulk of the monies deposited to the Martins, the court must consider the value of the claim arising from Gale's tax lien.

The parties have not cited any cases in support of their respective positions on the issue of who is entitled to the monies deposited with the court as compensation for the condemnation. Likewise, the court's independent research has revealed only a small number of helpful cases. The outcome depends upon which fork of authority the court follows from an as-yet unresolved circuit split emanating from the 1940s.

The first line of authority is represented by *Weber v. Wells*, 154 F.2d 1004 (9th Cir.1946). In *Weber*, a parcel was sold in 1937 to the State of California for delinquent taxes. The United States took the property in April 1942. On July 14, 1942, the San Francisco tax collector purported to sell the parcel to an individual who claimed title. Based upon that "sale," the individual claimed entitlement to the monies deposited with the court by the United States. The court's analysis is worth quoting at length:

At the time of the purported tax sale on July 14, 1942, did the State of California have any interest in said land to sell? We think not. From the time of the sale to the State of California on the 25th day of June, 1937, the owners had five years to redeem. The legal title remained in the appellees as taxpayers subject to a lien in favor of the State. In effect 'it' was 'not a sale but * * * merely a book transaction to facilitate the adjustment of accounts between the tax collector and the auditor.' *Ducey v. Dambacher*, 27 Cal.App.2d 658, 661, 81 P.2d 597. On April 22, 1942, the date of the judgment awarding immediate possession and delivery of the land to the Government, the period of redemption had not run. The legal title to said land, on said date, passed from appellees to the Government and the lien held by the State of California was, by operation of

---

**3.** On August 21, 2002, Congress revised, codified, and enacted, without substantive change, certain general and permanent laws related to public buildings, property, and works. Title 40 U.S.C. § 258a, the authority for the instant taking, was affected by the change. Pub.L. No. 107–217, 116 Stat. 1062 (codified at 40 U.S.C. § 3114). Because the taking and all subsequent material events occurred before the amendment, the court quotes § 258a as it existed prior to the amendment.

law, lifted from the land and impressed upon the fund received from the Government in payment therefor.

The Tax Collector of the City and County of San Francisco, on July 14, 1942, in professing to sell the land to appellant, performed an idle act. The State of California at the time had no claim or lien upon the land whatsoever. It had nothing to sell when appellant attempted to buy; hence, he bought nothing. He argues that the sale to the Government did not extend the period of redemption. Quite true, but it left nothing to which a redemption period could relate or become effective. The entire picture was changed by the taking of title by the Government and out of the

funds in the custody of the United States District Court was the State to receive the money due it for taxes, not from sale of an interest in the land. The persons entitled to the remainder of the fund, after the lien of the state is satisfied, are the owners at the time of the taking, in this case, the appellees, not appellant.

Id. at 1004 (emphasis added) (footnotes omitted).[4]

In contrast to Weber is an earlier decision by the United States Court of Appeals for the Second Circuit in United States v. Certain Lands in Hempstead, 129 F.2d 918 (2d Cir.1942). In Hempstead, a parcel owned at the time by Boris and Molly Kramer was sold to the County of Nassau for 1934 taxes and the United States took a parcel in July 1937.[5] Just compensation

---

**4.** In a case similar to Weber, the City of Pittsburgh took title to a certain parcel after a tax sale. United States v. 247 Acres of Land, 104 F.Supp. 938 (W.D.Pa.1952). The district court held that while the delinquent taxpayers enjoyed the right to redeem the property at any time pursuant to state law, the United States' declaration of taking caused title to depart from the city. The court further held this departure of title extinguished the right of redemption. Id. at 941. Weber's holding is also reflected in the discussions of at least two popular legal encyclopedias. See 27 Am. Jur.2d Eminent Domain § 811 (2d ed.1996); 7 Fed. Proc. L.Ed. § 198 (1991).

**5.** The exact nature of the property interest sold to the County is unclear. The opinion itself simply states that "In July 1936 the property had been sold to the County of Nassau for 1934 taxes." Hempstead, 129 F.2d at 918. In 1941, the Court of Appeals for New York referred to a tax sale purchaser as "the inchoate titleholder of the land." In re Ueck's Estate, 286 N.Y. 1, 35 N.E.2d 624, 631 (1941). Comparatively, Nassau county court opinions from the same time period refer to the interest acquired at a tax sale alternatively as a "tax lien" and as "an equitable title which does not ripen into legal title until the redemption period has expired." Seabald v. Gross, 162 Misc. 242, 295 N.Y.S. 72, 73 (1937); Nassau Cty. v. Dunn, 11 N.Y.S.2d 955, 959 (1939).

The court has reviewed a copy of the New York state statutory scheme for property tax sales in effect when Hempstead was decided. The statute sheds little light on the nature of the interest sold at New York property tax sales in the 1940s. The following quote is exemplary of the problem:

The collection of every assessment and every tax upon real estate returned by the receivers of taxes as unpaid, with the interest and additions, shall be enforced by a sale of the real estate by the county treasurer, subject to the right as hereinafter provided of the purchaser at such sale to change or convert such sale into a transfer of the tax lien or the right of the county to collect such taxes.

N.Y. Law 1919, ch. 154, Art VII, § 80.

The precise nature of the property interest held by the County is of interest to the court because it may explain the split of authority. The cases and statute cited above suggest that the New York statutory scheme for property tax sales in operation when Hempstead was decided may have provided tax sale purchasers with some greater interest in the property than that of a lien. In such case, it would be more logical to view a condemnation as a taking of the property from the purchaser and to award the compensation funds to the purchaser, subject to the original owner's right to redeem. In other words, the seeming split may result from differences in the statutory schemes for tax sales in effect in New York and California during the 1940s. West Virgi-

was deposited with the court on November 30, 1939, and title vested immediately in the United States. The redemption period passed without action by the Kramers, and on February 6, 1941, the County received a tax deed to the premises. The County sought the entire sum deposited by the United States, because the Kramers never exercised their right of redemption and failed to seek any portion of the deposit. The district court ordered the County to be paid for the taxes, interest and penalties due and the balance of the award be paid to the Kramers. The court of appeals reversed, holding the County was entitled to the entire deposit.

In the case at bar the period of redemption had not expired before title vested in the United States, but we see no reason why this should necessitate a different result. *Condemnation should not extend the statutory period of redemption any more than it should obliterate the effect of the expiration of the period. Kaufman v. Valente*, 115 Conn. 428, 162 A. 693. The right to redeem from a tax sale can be exercised only in the manner permitted by statute. *Levy v. Newman*, 130 N.Y. 11, 28 N.E. 660 (1891); *People v. Moynahan*, 148 App. Div. 744, 746, 133 N.Y.S. 361 (2d Dep't 1912). *Condemnation should affect the rights of parties having interests in respect to the land taken only so far as necessary to assure the sovereign's title.* As between themselves the tax sale purchaser is privileged to remain quiescent and the former owner must make the payments specified in the statute if he would exercise his power of redemption. N.Y. Laws 1919, Ch. 154, Secs. 89, 93. *Since the award takes the place of the land, it is reasonable to require the owner to redeem in order to obtain the award, just as he would have to do to* *recover the land, had condemnation not intervened.* If the rule were otherwise the inequitable result would be that the former owner could reserve his privilege to redeem until he learned whether the award would be greater or less than the sum required to exercise the privilege. *Id.* at 919 (emphasis added) (footnote omitted).

Both *Weber* and *Hempstead* share similarities with the instant case. First, all three cases concerned a property which was the subject of a tax sale and was later taken by the United States through eminent domain. Second, the redemption periods in all three cases apparently lapsed after the respective takings. Third, following the running of the redemption periods and the takings, the tax sale purchasers attempted to transfer, or receive, "ownership" of the properties. *Weber* held the lienholder had no title to transfer or receive following the taking, given that the United States took a fee simple interest in the property by operation of law when the deposit occurred. The amount recoverable by the lienholder was the amount of taxes due, the remainder being available for distribution to the record owner of the property at the time of the taking. In contrast, *Hempstead* held the redemption period continued to run even after the taking. Instead of focusing on the divestiture of title wrought by the taking, the court in *Hempstead* held, without any supporting federal condemnation authority, the delinquent owner was required to redeem in order to obtain the sum deposited by the United States.

■ *Weber* represents the better approach. At a minimum, it is more consistent with two bedrock principles of eminent domain jurisprudence. First, it gives

---

nia's statutory scheme for tax sales is a lien-based system and, as such, more closely ap- proximates the statutory scheme underlying the *Weber* decision.

full effect to the absolute title shift that occurs at the time of the taking. As the statute suggests, when a taking occurs, the United States is immediately vested with an absolute, fee simple interest. *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 4–5, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) ("The Government is obliged, at the time of the filing, to deposit in the court, 'to the use of the persons entitled thereto,' an amount of money equal to the estimated value of the land. Title and right to possession thereupon vest immediately in the United States.")(footnote omitted); *United States v. Mock,* 476 F.2d 272, 274 (4th Cir.1973) (refusing to recognize a post-taking private transfer of certain property and observing "It is well settled-and the appellees do not seriously argue otherwise that, if the Declaration was valid under the provisions of Section 258a, 40 U.S.C., title to the property in question passed to the Government."). The court parts company with *Hempstead* to the extent it suggests redemption, functionally or otherwise, has any role after a taking has occurred under § 258a. There is nothing left to exercise the right of redemption against following the taking.

Second, *Weber* requires the taking of a "snapshot" of the parties' respective interests, and the values of those interests, at the time of the taking. This, too, is consistent with the well-settled principle that " '[j]ust compensation[ ]' ... means in most cases the fair market value of the property on the date it is appropriated." *Kirby,* 467 U.S. at 10, 104 S.Ct. 2187 (quoting *United States v. 564.54 Acres of Land,* 441 U.S. 506, 511–13, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979)). Although the Supreme Court has recognized this rule might work an inequity in some cases, it deemed the sacrifice necessary to assure "a clear, easily administrable rule governing" just compensation. *Id.* at 10 n. 15, 104 S.Ct. 2187. The bright-line approach permits fair and equitable compensation at the moment the estate is divested, without allowance for earlier or later events that might otherwise be introduced by a compensation process that allows for adjustments based on contingencies. Instead of focusing on the value of the property interest held by the purchaser at the time of the taking, *Hempstead* would seemingly permit the recovery of other costs as well that are typically associated with the right of redemption. I disagree with *Hempstead* on that point. Any approach providing compensation in excess of the value of the lien at the time of the taking, along with accrued interest, would undermine well-settled principles of federal eminent domain jurisprudence. While compensation for the value of the lien and associated interest is appropriate in this circuit, anything more is a windfall unauthorized under law. *See Coggeshall v. United States,* 95 F.2d 986, 990 (4th Cir.1938)("We are of the opinion that the court below was right in holding that the taxes due the county of Berkeley up to the time the title was vested in the United States were a lien on the fund in the hands of the court.").

■■■ Following *Weber,* the court **FINDS** that on the date of condemnation, title to the property passed from the Martins to the United States and the tax lien held by Gale lifted, by operation of law, from the property and attached to the compensation fund deposited with the court. The sole remaining issue is determining the value of Gale's claim. Once a taking has occurred, the West Virginia statutory scheme for redemption is no longer relevant and cannot be used to value a tax lien. Under condemnation law, Gale's claim is limited to the value of the tax lien at the time of the taking plus the interest that has accrued on that sum since it was deposited with the court. *See S.C. Pub. Serv. Auth. v. 11.754.8 Acres of Land,* 123 F.2d 738 (4th Cir.1941). *See general-*

ly, L.S. Tellier, *Rights in respect of real–estate taxes where property is taken in eminent domain,* 1956 WL 11544, 45 A.L.R.2d 522 (2004). The taking in this case occurred seven days after the tax sale, and no additional tax accrued on the property between the purchase of the tax lien and the condemnation. Thus, the value of the tax lien on the date of condemnation is the amount paid at the tax sale, $937.87. The additional costs claimed by Gale, including notice fees, certified letter fees, publication fees, clerk fees, property taxes paid after the condemnation, and legal fees, are simply not compensable in this setting.

The court **GRANTS** Gale's motion for summary judgment insofar as Gale seeks compensation for the value of the tax lien on the date of condemnation plus any interest accrued on the value of the tax lien since that date and **DENIES** the motion insofar as it seeks any additional compensation [Docket 47]. The remainder of the deposited amount shall remain available for distribution to the remaining condemnees who have not received compensation. The United States and the guardian *ad litem* are hereby **ORDERED** to file with the court a joint status report within thirty days of the date of this order regarding the status of the remaining payout. In addition, the court **ORDERS** Gale to file a statement with the court within thirty days of the date of this order that states the amount of interest that has accrued on the value of the tax lien, $937.87, since the United States deposited the compensation funds with the court. Thereafter, any party who wishes to respond to Gale's statement shall do so within fourteen days of filing. The court will then review the filings and order Gale to be paid the correct amount from the registry. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and **DIRECTS**

the Clerk to post this published opinion at *http://www.wvsd.uscourts.gov.*